THE STATE OF NEW JERSEY (F), PLAINTIFF-
RESPONDENT, v. M., DEFENDANT-APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued April 24, 1967—Supplemental Brief Filed June 14, 1967—
Decided July 18, 1967.

336

Before Judges LEWIS, LABRECQUE and CONFORD.

*Mr. Matthew T. Rinaldo* argued the cause for appellant (*Messrs. Rinaldo & Rinaldo,* attorneys).

No appearance or brief for respondent.

The opinion of the court was delivered by

LEWIS, J. A. D. Plaintiff F commenced this action against M by filing a complaint with the Borough of Princeton Municipal Court alleging that defendant was the father of her child C, born out of wedlock on May 21, 1963. Plaintiff sought to compel defendant to provide support for the child pursuant to *N. J. S. A.* 9:16–1 *et seq.*

On January 29, 1965 defendant was adjudged to be the father of C and the magistrate imposed support payments of $15 per week. Defendant appealed to the Mercer County Court where, after a trial *de novo* before a jury, he was found by a verdict of 10 of the 12 impaneled jurors, to be the putative father and ordered to pay $15 per week support. He now appeals to this court contending: (1) the verdict was against the weight of the evidence; (2) the charge was inadequate, confusing and misleading; (3) the court erred in charging the jury that it might reach a verdict if only five-

sixths of its number (ten jurors) agreed, and (4) his deposit to secure a bond should be returned.

Subsequent to the filing of the complaint defendant had been required to post bail of $1,500 pending the municipal court trial; after the judgment of paternity the bail deposit was continued as cash security for a bond to assure compliance with the support order. Eventually $500 was released by the municipal magistrate, but both the latter and the County Court judge refused to return the balance of the money. Defendant now urges that even if the judgment against him be affirmed the bond should, nonetheless, be revoked because there is no authority under *N. J. S. A.* 9:16–1 *et seq.* for its exaction.

I

██ Our study of the record leads to the conclusion that there is sufficient evidence to support the jury verdict. Plaintiff testified in depth as to her relationship with defendant. She related a continuing course of sexual intimacy, culminating in the act of intercourse alleged to have resulted in the child's conception. Although defendant admitted to being in plaintiff's company on the crucial date, August 25, 1962, he stated that their relationship was strictly platonic. One Henry R. Kalmus gave evidence for plaintiff; he corroborated her testimony to the extent that on the day in question the conduct of the parties at Manasquan was more than platonic.

 The law of this jurisdiction is well settled that in a bastardy proceeding

"* * * the burden of proof does not require proof of paternity beyond a reasonable doubt, but merely by a fair preponderance of the evidence. *Overseer of Poor of Town of Montclair v. Eason*, 92 *N. J. L.* 199, 201–202, 1 *A. L. R.* 631 (*E. & A.* 1918). Neither is it necessary to a finding against the putative father that the testimony of the mother be corroborated. * * * [*Ibid.*]." *I. v. D.*, 60 *N. J. Super.* 211, 217 (*App. Div.* 1960).

In this light, we are not able to say that the jury's verdict was against the weight of the evidence.

## II

■ We have examined the charge which defendant claims was inadequate, confusing and misleading. We find that the court's instructions were short and clear, and that they were fair, reasonably comprehensive and did not possess the capacity to mislead the jury.

## III

We turn now to defendant's third point and major argument on appeal. Our State Constitution provides that

"The right of trial by jury shall remain inviolate * * *. The Legislature may provide that in any *civil* cause a verdict may be rendered by not less than five-sixths of the jury." (Emphasis supplied) *N. J. Const.* 1947, *Art.* I, *par.* 9.

The Legislature, acting in pursuance of constitutional authority, enacted *N. J. S.* 2A:80–2:

"In any *civil* cause wherein a jury of 12 shall be impaneled, a verdict may be rendered by 10 or more of the jury agreeing * * *. Any verdict so rendered shall have the same force and effect as though it had been rendered by the entire jury." (Emphasis supplied) *L.* 1948, c. 120, § 1, *p.* 831.

The issue now to be resolved is what the Constitutional Convention and the Legislature intended by use of the word "civil." The core question is whether the word should be strictly construed so as to apply only to those proceedings purely civil, or be given a broader reading which would include any cause not purely criminal.

■ We are put to that choice by the unique status of bastardy proceedings in the law. Filiation statutes are generally considered to represent an exercise of the police power for the primary purposes of denouncing the misconduct

involved, punishing the offender or shifting the burden of support from society to the child's natural parent. See *Kowalski v. Wojtkowski*, 19 *N. J.* 247, 252, 53 *A. L. R.* 2d 556 (1955); *Leonard v. Werger*, 21 *N. J.* 539, 541 (1956). Thus, it has been written:

"* * * In jurisdictions where the purpose of a filiation proceeding is simply to compel the putative father to support his child, it is almost uniformly held to be a civil proceeding, by nature, and governed by the rules of procedure applicable to civil actions. In a few jurisdictions, however, bastardy proceedings are considered to be criminal in nature; this is usually because the statute creating the particular proceeding provides a punishment for the putative father in addition to providing for the child's support. In several jurisdictions bastardy proceedings are considered by the courts to partake of the nature of both civil and criminal suits, and are termed by them sometimes as quasi-criminal or quasi-civil, and sometimes, though rarely, as suits sui generis." 10 *Am. Jur.* 2d, *Bastards*, § 75, *pp.* 901–902 (1963).

Accord, 10 *C. J. S. Bastards*, § 32a, *pp.* 143–144 (1938); Annotation, 94 *A. L. R.* 2d 1128, 1129 (1964).

In New Jersey, "Reconciliation of the criminal-civil dichotomy which generally appears in bastardy statutes has long been a source of judicial difficulty in the construction of legislation in this field." *State, ex rel. Acorman v. Pitner*, 80 *N. J. Super.* 91, 94 (*App. Div.* 1963), reversed on other grounds 42 *N. J.* 251 (1964). In the case of *In re El.*, 26 *N. J. Misc.* 285, 60 *A.* 2d 893 (*Cty. Ct.* 1948), Judge Drewen considered the dichotomy. He wrote:

"* * * The Court of Errors and Appeals in *Montclair v. Eason*, 92 *N. J. L.* 199; 104 *Atl. Rep.* 291 (Mr. Justice Parker), said: 'It may be conceded that bastardy proceedings are sometimes characterized as criminal or *quasi*-criminal in character, but usually they are held to be in the nature of civil proceedings. * * * In this state it seems to be settled that they are civil or at least *quasi*-civil. (*Montclair v. Eason*, 92 *N. J. L.* 199; 104 *Atl. Rep.* 291.)' To show complete absence of category we need nothing more than the quoted statement. In the city's brief the proceedings are spoken of as 'essentially civil.' In *Thatcher v. Hackett*, 16 *N. J. Mis. R.* 459; 1 *Atl. Rep.* (2d) 438 [*Cty. Ct.* 1938], the court considers the element of conflict between the legislative grant of appellate jurisdiction to the Quarter Sessions, a criminal court, and the pronouncement in *Montclair v. Eason, supra*.

341

In *Dally v. Overseers of Woodbridge*, 21 *N. J. L.* 491, the question was whether character evidence, admissible ordinarily only in a criminal case, was proper under a charge of bastardy. Such evidence had been excluded at the trial on the ground that it is allowable only in a criminal case. The Supreme Court reversed and declared the case to be 'not strictly civil' so as to exclude character testimony. See, also, *Hawkins v. State*, 21 *Id.* 630. So, there is nothing to be gained by attempts at classification." 26 *N. J. Misc.*, at *p.* 287; 60 *A. 2d*, at *p.* 895.

The court concluded that "the denomination applied by our appellate courts in decisions on the point appears uniformly to depend upon the nature of the question presented; that is, the proceedings are to be thought of as *quasi*-criminal for some purposes and as *quasi*-civil for others." *Ibid.*

An analysis of our reported decisions reveals that for most purposes the cases have held bastardy proceedings to be civil in nature. See, concerning actions brought under *N. J. S. A.* 9 :17–1 *et seq.* and its predecessors (proceedings initiated by an official agency) : *Hildreth v. Overseers of Poor*, 13 *N. J. L.* 5, 6–7 (*Sup. Ct.* 1831) ; *Leconey v. Overseer*, 43 *N. J. L.* 406, 407 (*Sup. Ct.* 1881) ; *Overseer of the Poor, Montclair v. Eason, supra*, 92 *N. J. L.*, at *pp.* 202–203; *Calaway v. Town of Belleville*, 116 *N. J. L.* 377, 378 (*Sup. Ct.* 1936) ; *Thatcher v. Hackett, supra*, 16 *N. J. Misc.*, at *p.* 460, 1 *A. 2d*, at *p.* 439; *Overseer of Poor, Kenilworth v. Koznowicz*, 50 *N. J. Super.* 218, 220 (*Cty. Ct.* 1958). With respect to *N. J. S. A.* 9 :16–1 *et seq.* (proceedings instituted by a mother) see : *Jessen v. De Bernardo*, 52 *N. J. Super.* 227, 230 (*J. & D. R. Ct.* 1958) ; *M. v. F.*, 55 *N. J. Super.* 548, 550 (*Cty. Ct.* 1959), reversed on other grounds 60 *N. J. Super.* 156 (*App. Div.* 1960) ; *State ex rel. Acorman v. Pitner*, 42 *N. J.* 251, 256 (1964) ; *M. v. F.*, 95 *N. J. Super.* 165, 172 (*J. & D. R. Ct.* 1967).

The basic rationale for all these decisions was stated as early as 1831 when, in *Hildreth v. Overseers of Poor, supra*, the court explained that an "order of affiliation and maintenance is not for the punishment or prevention of crime, or for the reformation of morals, but to compel the putative

father to pay for the maintenance of his illegitimate off-spring, and thus to protect the township from any charge for its support." 13 *N. J. L.*, at *pp.* 6–7.

The general provisions in our court rules governing bastardy actions are in Part VII, "Rules Governing Civil Practice in the County District Courts and Municipal Courts." *R. R.* 7:15 *et seq.* However, see *R. R.* 8:7–1 which serves to indicate that bastardy proceedings also fall within the practice rules of the "Local Criminal Courts."

■ We recognize that a bastardy proceeding is not purely civil, and that a defendant has substantial interests which merit full judicial protection (note, Schatkin, "Should Paternity Cases Be Tried in a Civil or Criminal Court?" 1 *Crim. L. Rev.* (*N. Y.*) 18, 26–27 (1954); Wysong, "The Jurisprudence of Labels—Bastardy as a Case in Point," 39 *Neb. L. Rev.* 648 (1960)), but we conclude that the device of the unanimous verdict is not necessarily an essential institution for the protection of those interests.

Research indicates that all other jurisdictions which have dealt with the issue have upheld less than unanimous verdicts. *Welford v. Havard,* 127 *Miss.* 88, 89 *So.* 812 (*Sup. Ct.* 1921); *State ex rel. Gill v. Volz,* 156 *Ohio St.* 60, 100 *N. E. 2d* 203, 210 (*Sup. Ct.* 1951); *State v. Newman,* 109 *Or.* 61, 218 *P.* 936, 938 (*Sup. Ct.* 1923); *State ex rel. Dickerson v. Tokstad,* 139 *Or.* 63, 8 *P. 2d* 86, 88 (*Sup. Ct.* 1932); *State ex rel. Crooks v. Cummins,* 56 *S. D.* 439, 229 *N. W.* 302, 303 (*Sup. Ct.* 1930); *State v. McKnight,* 76 *Utah* 514, 290 *P.* 774, 775 (*Sup. Ct.* 1930).

■ One of the reasons for adopting the constitutional provision was to "avert unjust verdicts" that resulted from the power that one or two recalcitrants or dishonest jurors held over their fellow jurors, often requiring compromise verdicts. Marantz, "Shall We End the Unanimity Rule for Verdicts in Civil Cases?" 70 *N. J. L. J.* 269 (1947). Another reason was the avoidance of economic waste incident to costly retrials. I *Proceedings of the Constitutional Convention of* 1947, 686–687. A final goal was to help eliminate

court congestion and the inherent unfairness in justice delayed. *Id.,* at *p.* 610; Marantz, *supra.* The five-sixths verdict was viewed as a practical plan to improve the jury system and overcome the abuses that had "been exposed by time and experience." I *Proceedings, supra,* at *p.* 610.

Absent a clear showing that the number of jurors concurring in the verdict falls within the *quasi*-criminal aspects of a bastardy proceeding, we decline to abrogate the advances made at the Constitutional Convention in this area of the administration of justice.

Those authorities which argue for affording "defendant criminal protection rather than deprive him of *some* of the rights to which he is entitled," Wysong, *supra,* 39 *Neb. L. Rev.,* at *p.* 674, center their attack on the role of the jury *per se* in the emotion-charged arena that is the bastardy proceeding. In discussing the emotional nature of the cause Professor Krause has written:

"The type of paternity proceeding now available in many states may not provide the best possible mechanism for ascertaining paternity. There is room for doubt and reason for concern if the percentage of convictions in paternity cases reaches 95% in a typical metropolitan county. See Glazer, *Blood Grouping Tests in the Proof of Non-Paternity,* 33 Mich. St. B. J., No. 1, pp. 12, 17 (1954). * * * The difficulty may center on the jury which seems especially likely to err in the emotion-charged atmosphere of the typical paternity suit because deep-seated notions of morality tend to transcend applicable secular law." Krause, "Equal Protection for the Illegitimate," 65 *Mich. L. Rev.* 477, 490, *n.* 57 (1967).

That there is merit to the point none would deny, but we are not here to consider whether or not this action should have been tried by a jury. That issue resides with the people in their capacity to amend the Constitution and abrogate the practice initiated under the common law.

We hold that neither the Constitution of New Jersey nor the statute requires that the verdict in a bastardy proceeding be unanimous. *Cf. State v. Gibson,* 15 *N. J.* 384, 42 *A. L. R. 2d* 461 (1954); *Aponte v. State,* 30 *N. J.* 441, 444 (1959).

## IV

We finally consider the matter of the bond. In *State v. Arbus,* 54 *N. J. Super.* 76 (*App. Div.* 1959), we held:

"The County Court has no authority, in a proceeding under *N. J. S. A.* 9:16–3, to exact a bond. A bond is provided for in proceedings under *N. J. S. A.* 9:17–2, but there are no provisions for one in *N. J. S. A.* 9:16–1 *et seq.* It is true that the Supreme Court said in *Leonard v. Werger, supra,* 21 *N. J.,* at *page* 543 that 'in legislative contemplation chapters 16 and 17 are to be considered as intertwined enactments, particularly as respects the processing of an action under chapter 16 to accomplish its objectives.' However, the court there was dealing not with the posting of a bond but with the right to appeal. Our study of those sections of *chapter* 17 relating to bonds brings us to the conclusion that (even under the broad approach of the *Leonard* case) it is impossible to extend those sections to compel a bond in a mother's proceeding under *chapter* 16. See *N. J. S. A.* 9:17–13 to 16; *N. J. S. A.* 9:17–30 to 32, 33." (at *pp.* 81–82)

■ That ruling clearly supports defendant's contention that the courts below had no authority to hold $1,000 as a bond to secure the support orders. We have been presented with no reason why a departure should be made from our prior decision.

The judgment of the County Court, insofar as it adjudges defendant to be the father of C and orders him to pay $15 per week for her support, is affirmed. The bond is ordered discharged.